Filed 9/18/25  P. v. Mendez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MYNOR MENDEZ,<br><br>    Defendant and Appellant. | B331036<br><br>Los Angeles County<br>Super. Ct. No. BA252624 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Sabrina R. Damast for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Analee J. Brodie and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

On September 17, 2004, defendant and appellant Mynor Mendez (Mendez) pleaded no contest to one count of attempted murder (count 1) and one count of robbery (count 4).  He further admitted gang and firearm allegations with respect to count 4.  Pursuant to the plea agreement, the prosecution dismissed the remaining counts and allegations.  The trial court sentenced Mendez to a term of 22 years, 8 months in state prison.

On February 7, 2023, Mendez filed a motion to vacate his conviction under Penal Code[1] section 1473.7.  Mendez argued his conviction was invalid because he was unable to meaningfully understand the immigration consequences of his plea due to prejudicial error.  Before holding a hearing, the trial court issued a lengthy tentative ruling, outlining a denial of the motion on numerous bases.  In response, Mendez filed a motion to recuse the trial judge on the ground he had prejudged the section 1473.7 motion before holding the hearing required by statute.[2]  Mendez also filed a supplemental motion responding to the substance of the trial court's tentative ruling.

By written order and supporting declaration, the trial court denied the recusal motion.  The court then held a hearing on the section 1473.7 motion at which Mendez testified.  Six days later, the trial court issued a final written order, substantially conforming to its tentative ruling and denying Mendez's motion to vacate his conviction.

---

[1]    All undesignated statutory references hereinafter are to the Penal Code.

[2]    Section 1473.7, subdivision (d) simply provides, in pertinent part: "All motions shall be entitled to a hearing."

2

On appeal, Mendez argues the trial court committed reversible error by (1) denying his section 1437.7 motion to vacate on the merits; and (2) denying his motion to vacate in violation of the Racial Justice Act. We affirm.

## BACKGROUND[3]

During the 2004 plea colloquy, the prosecutor advised Mendez as follows: "If you're not a citizen of the United States, your plea here today will cause you to be deported, denied re-entry, denied naturalization, denied amnesty, denied re-entry [*sic*]." When asked if he understood the advisement, Mendez replied "Yes." The court made no independent inquiry, nor gave any further advisements, regarding the immigration consequences of Mendez's plea. Similarly, defense counsel said nothing regarding having advised Mendez of the immigration consequences of his plea.

At the conclusion of the colloquy, the trial court accepted the plea as "entered . . . knowingly, intelligently, and voluntarily." The court also found Mendez "understood the rights he [gave] up by entering these pleas" and "under[stood] the consequences" of his pleas, meaning "[he] under[stood] what's going to happen as a result of these pleas."

In 2023, Mendez moved to vacate the above conviction under section 1473.7 on the ground that due to prejudicial error he had not meaningfully understood the adverse immigration consequences of his plea. In a declaration filed in support of the motion, Mendez stated that at the time of his plea he was 19 years old and had been a lawful permanent resident of the United States since the age of 12. His parents and sister, too, were lawful

---

[3]    We limit this recitation to background information relevant to this appeal.

permanent residents. Shortly after his conviction, his parents obtained United States citizenship. His nephew, then a newborn, is a United States citizen. Mendez also indicated that at the time of his plea he was a high school student who worked nights at a retail store. Mendez stated he did "not recall [his attorney] advising [him] that [his] plea in this case would guarantee [him] the loss of [his] green card." Rather, he testified "[t]he most important consideration in taking the plea was protecting [his] green card and remaining in the United States with [his] family. [He] had no connection to Guatemala. [He] had left that country when [he] was a very young child, and [his] entire family and life was in the United States. [He] was prepared to go to prison for a long time, but not to also be deported from the country."

Upon release from state prison after serving his sentence, Mendez was transferred to Immigration and Customs Enforcement (ICE) custody and, though since released, is now facing deportation proceedings. Mendez indicated that had he understood the immigration consequences of his plea, he would not have accepted the plea offer, even if the alternative was a plea requiring a longer prison sentence or going to trial.

Finally, Mendez described the efforts he has made since his release from ICE custody to rebuild his life and to be "a productive member of [his] community." He now works multiple jobs, including one as a support tutor for Homeboy Industries, has earned his associate degree through community college, and has been accepted to multiple four-year colleges. He was also successfully discharged from parole, has taken anger management classes, and has spoken as a panelist at a college summit regarding the relationship between obtaining an education and the prison system. He indicated his goal now is to become a social worker and to work with at-risk youth.

Private defense counsel Alan Fenster, who represented Mendez at his plea proceedings, also submitted a declaration in support of the motion to vacate. Mr. Fenster indicated he did not recall Mendez's case, nor had he retained the case file. Nonetheless, he stated "it is doubtful that [he had] researched or advised Mr. Mendez about the potential immigration consequences of his plea in this matter."

Immigration attorney Keli Reynolds, a defense expert on the immigration consequences of criminal convictions, also submitted a declaration in support of Mendez's motion to vacate his conviction. Ms. Reynolds explained that both of Mendez's counts of conviction are aggravated felonies and crimes involving moral turpitude. As such, both are grounds for deportation and inadmissibility. (See 8 U.S.C. § 1227(a)(2)(i); 8 U.S.C. § 1182(a)(2)(A)(i)(1).) Ms. Reynolds opined that had Mendez instead pleaded no contest to violating section 246 (an offense with which he was originally charged) and admitted the street gang allegation as defined in section 186.22, subdivision (b)(1), he still would have faced a lengthy incarceration but without the adverse immigration consequences he now confronts.

Prior to hearing the motion, the court issued a 25-page tentative ruling, setting forth its reasoning for denying the motion. Based on the court's issuance of the tentative ruling, Mendez filed a motion requesting the trial judge recuse himself for having prejudged his section 1437.7 motion before holding a hearing. The court denied the motion.

On April 4, 2023, the trial court held a hearing on Mendez's section 1473.7 motion. Mendez testified that he did not meaningfully understand the immigration consequences of his plea, and that if he had understood them, he would not have accepted the plea. Specifically, at that time, he did not appreciate the legal difference between having a green card (which he did)

5

and being a United States citizen (which he was not).  Thus, given the lack of any advisement on the issue from his attorney, he did not understand how, if at all, the prosecutor's in-court advisement would adversely affect him.  He further stated that while incarcerated he had rejected repeated offers to serve the remainder of his sentence in Guatemala and would have considered a plea resulting in a sentence of up to life in prison in order to remain in the United States.  He testified: "I have no recollection of being in Guatemala.  All I have is vague memories of being there.  So . . . I would be willing to risk it, being in prison for the rest of my life, because at least I would be here in the United States where I grew up close to my family and my kid, to everybody I know."  The court pressed him on the fact that if the motion were granted, he would be facing a potential sentence of 75 years to life and thus be subject to remand back into custody.  Mendez replied:  "To be here with my family and my community and having a chance to one day come back home, what I consider my home, yes.  I'm willing to take that risk. . . .  If you send me back to Guatemala I might as well be dead."  Mendez also detailed his family connections in the United States, the fact that he has a son, born while he was in prison,[4] who he sees weekly and to whom he provides financial support, two sisters who live in California with whom he communicates daily and sees regularly, and parents with whom he currently lives.

On April 10, 2023, the trial court issued a 35-page written order denying Mendez relief.  First, the court found Mendez's in-court testimony not credible and "entitled to virtually no weight."  It found particularly suspect Mendez's testimony that his paramount concern at the time of his

---

[4]     He indicated that at the time of his plea he was engaged to his son's mother.  But the relationship did not survive his incarceration.

plea was to remain in the United States, rather than limit his incarceration exposure. The court noted Mendez expressed no concern regarding immigration consequences during the plea colloquy. Rather, "his sole focus was on avoiding the life sentence with a seventy-five-year minimum eligibility for parole" that accompanied the charges he then faced. The court further based its conclusion that Mendez's testimony lacked credibility on his "often evasive answers" and its observation of his demeanor and behavior while testifying, specifically, that he answered questions posed by his own counsel with facility but hesitated and looked towards the ground in testifying on cross-examination.

With this credibility determination, the court found no prejudicial error in the immigration advisements Mendez received. In so finding, the court accepted as true, at least for the sake of argument, that defense counsel had not discussed with Mendez the immigration consequences of his plea prior to its entry.[5] Nonetheless, the court found the prosecutor's in-court advisement—and Mendez's reply that he understood that advisement—to be legally sufficient to ensure Mendez's understanding.

The court further concluded that any deficit in the advisements impacting Mendez's ability to meaningfully understand the immigration consequences of his plea did not prejudice him due to his lack of ties to the United States at the time of his plea and the unlikelihood that his case could have resolved in an immigration-neutral manner. The court indicated

---

[5] The trial court noted that, until *Padilla v. Kentucky* (2010) 559 U.S. 356, criminal defense counsel did not have an affirmative obligation as part of competent representation to advise a defendant of the potential immigration consequences of a plea, as those consequences were considered "collateral" to the conviction. Thus, the trial court noted it "would not be surprising" if, in 2004, defense counsel had not discussed immigration consequences with Mendez before his plea. (*Ibid.*)

7

Mendez's current efforts at rebuilding his life have "absolutely no bearing" on whether he was prejudiced by any error in the immigration advisements. Rather, the court found only Mendez's ties *at the time of his plea* relevant in assessing prejudice. The court concluded Mendez had not shown he was prejudiced by any error or deficit in the immigration advisements and therefore denied the motion.

Mendez appeals that denial, arguing the court erred in denying his section 1437.7 motion by finding first, that he meaningfully understood the adverse immigration consequences of his plea and second, that even if he lacked such understanding, Mendez did not suffer any prejudice as a result. We affirm on both grounds.

Mendez also argues that, in making certain findings in its denial of the section 1437.7 motion, the trial court violated the Racial Justice Act. Because Mendez did not raise this claim in the trial court, we find it forfeited on direct appeal. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 813.)

## DISCUSSION

I.    *Trial Court's Denial of Mendez's Section 1437.7 Motion to Vacate his Plea Based on Lack of Understanding of Immigration Consequences*

A.    *Governing Law*

Under section 1473.7, subdivision (a)(1), "[a] person who is no longer in criminal custody may file a motion to vacate a conviction or sentence . . . [¶] [if] [t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." "Adverse

8

immigration consequences" means "removal or deportation, exclusion, or the denial of naturalization or lawful status of persons who plead guilty" to particular charges. (*People v. Gregor* (2022) 82 Cal.App.5th 147, 164 [finding loss of ability to sponsor relative for citizenship due to criminal conviction did not constitute "adverse immigration consequence" in that such consequence did not impact defendant's "personal immigration status"].)

"A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a prejudicial error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea. (*Id.*, subds. (a)(1), (e)(1).)" (*People v. Vivar* (2021) 11 Cal.5th 510, 517 (*Vivar*), italics omitted.) The movant must show first, that he did not understand the immigration consequences of his plea,[6] then second, that his misunderstanding constituted prejudicial error. (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)

"'[P]rejudicial error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.'" (*Espinoza, supra*, 14 Cal.5th at p. 319.) "To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.'" (*Id.* at p. 320.) "If the defendant meets his burden of establishing prejudicial error, the court must grant the motion and allow the

---

[6]     As Mendez notes in his opening brief, the issue regarding the appropriate standard for determining whether a defendant has shown failure to understand the immigration consequences of a plea is currently pending review by the California Supreme Court. Defendant argues the proper standard is totality of the circumstances.

9

defendant to withdraw the plea." (*People v. Curiel* (2023) 92 Cal.App.5th 1160, 1172 (*Curiel*).)

We apply independent review to determine whether a defendant misunderstood the immigration consequences of his plea. (See *Vivar*, *supra*, 11 Cal.5th at pp. 524–525.) "We [likewise] apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences," that is, that his error in understanding was prejudicial. (*Espinoza*, *supra*, 14 Cal.5th at p. 319.) "'"[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law."'" (*Id.* at pp. 319–320.)

In exercising independent review, we must "give deference to the trial court's factual determinations if they are based on "'the credibility of witnesses the [superior court] heard and observed."'" (*Espinoza, supra*, 14 Cal.5th at p. 320.) "But when the trial court's findings 'derive entirely from written declarations and other documents,' the trial court and the reviewing court '"are in the same position,"' and no deference is owed." (*Ibid.*) In that case, "in determining whether the trial court erred in denying a motion to vacate a conviction, 'it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1437.7.'" (*Curiel, supra*, 92 Cal.App.5th at p. 1173.)

B.   *Mendez Faces Adverse Immigration Consequences as a Result of His 2004 Plea*

The parties do not dispute that attempted murder in violation of sections 664/187, subdivision (a) and robbery in violation of section 211 constitute both aggravated felonies (see 8 U.S.C. § 1227(a)(2)(i)) and crimes of

moral turpitude (8 U.S.C. § 1182(a)(2)(A)(i)(1)).  As such, it is also undisputed that Mendez's 2004 convictions have left him subject to adverse immigration consequences.

As a matter of federal law, "[a] noncitizen who is convicted of an aggravated felony at any time after admission is conclusively presumed deportable and is subject to mandatory removal.  (8 U.S.C. § 1228(c); see *id.,* § 1227(a)(2)(A)(iii).)  An aggravated felony conviction renders a noncitizen 'ineligible for cancellation of removal, a form of discretionary relief allowing some deportable aliens to remain in the country.  See [8 U.S.C. §] 1229b(a)(3), (b)(1)(C).  Accordingly, removal is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he previously resided here.'" (*People v. Villalba* (2023) 89 Cal.App.5th 659, 666–667 (*Villalba*), quoting *Sessions v. Dimaya* (2018) 584 U.S. 148).[7]

Again as a matter of federal law, a crime involving moral turpitude is a ground for deportation from, and inadmissibility to, the United States.  (8 U.S.C. § 1227(a)(2)(i)(1); 8 U.S.C. § 1182(a)(2)(A)(i)(1).)  As a ground of inadmissibility, such a conviction renders Mendez presumptively ineligible to apply for a new lawful permanent residency regardless of the strength of his ties to the United States.  (See 8 U.S.C. § 1255(a).)

C.    *Mendez Has Not Demonstrated He Did Not Meaningfully Understand the Immigration Consequences of His Plea*

---

[7]    In her declaration in support of Mendez's motion to vacate, Attorney Reynolds states that because Mendez received his current lawful permanent residency through the United States Consulate, his convictions now render him ineligible to apply for a waiver of inadmissibility as part of a new application for permanent residency, which in turn makes him ineligible for a new lawful permanent residency for the remainder of his life.

11

As set forth above, the trial court found Mendez not credible in testifying at his section 1437.7 hearing. Thus, the court disregarded his testimony that he did not understand the adverse immigration consequences of his plea before accepting the plea offer and that had he understood, he would have rejected the plea offer. Rather, the court determined Mendez's "sole focus was on avoiding the life sentence with a seventy-five-year minimum eligibility for parole" he then faced. In dismissing Mendez's credibility at the hearing, the court emphasized Mendez's demeanor while testifying, noting that although he answered defense counsel's questions with facility, he paused, looked to the ground, and was "evasive" on cross-examination. This finding, based on the trial court's own observation, requires our deference. (See *Vivar*, *supra*, 11 Cal.5th at p. 527.)

The trial court implicitly assumed, and the parties do not dispute, that neither Mendez's attorney nor the trial court ever advised Mendez on the adverse immigration consequences of his plea. Our review of the record also reveals no evidence that Mendez ever received or signed a written advisement (*Tahl* waiver) regarding such consequences. Rather, the only advisement Mendez received regarding the immigration consequences of his plea was in-court, from the prosecutor, who stated: "If you're not a citizen of the United States, your plea here today will cause you to be deported, denied re-entry, denied naturalization, denied amnesty, denied re-entry [*sic*]." The prosecutor's advisement addressed none of the nuances of immigration law as applied to Mendez. The advisement said nothing regarding the "virtual certainty" of Mendez's removal. (See *Villalba, supra,* 89 Cal.App.5th at p. 666.) The parties also do not dispute that at the time of his plea Mendez was young (19 years old); along with his parents and sister, had lawful permanent residency in the United States; and had no prior adult criminal convictions.

But even assuming without deciding that the prosecutor's in-court advisement was insufficient to ensure Mendez's meaningful understanding of the immigration consequences of his plea (see, e.g., *People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906 [where defendant facing mandatory deportation as a result of conviction, his initial *Tahl* waiver was akin to "generic advisement" required of the trial court under section 1016.5, which is "'not designed, nor does it operate, as a substitute for advice' of defense counsel regarding the applicable immigration consequences in a given case"]), Mendez has not established any deficit in his understanding was prejudicial.

D.    *Prejudice*

In *Vivar*, our high court identified a number of "particularly relevant" factors for courts to evaluate in determining whether a defendant was prejudiced due to an error in immigration advisements under section 1437.7. (*Vivar, supra*, 11 Cal. 5th at p. 530.)  These factors "include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Ibid.*)  "Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial." (*Espinoza, supra,* 14 Cal.5th at p. 320.)  We consider these factors as applied to Mendez.

1. *Mendez's Ties to the United States*

The trial court evaluated a number of uncontested facts in determining that Mendez lacked substantial ties to the United State and thus, had not

shown prejudicial error at his plea proceeding by a preponderance of the evidence.

a. *Length of Residence*

At the time of his plea, Mendez was 19 years old[8] and had been a lawful permanent resident since the age of 12. In his declaration in support of his motion to vacate, Mendez stated that he had moved to the United States from Guatemala as "a very young child." The trial court acknowledged that the date of Mendez's actual entry into the United States was unclear. But the court nonetheless concluded that the approximately five-year period during which Mendez had his lawful permanent residency did "not establish a long-term connection to the United States." In so finding, the court contrasted Mendez's situation with defendants for whom courts have found strong ties to the United States. (See *Lee v. United States* (2017) 582 U.S. 357 [where defendant had been in the United States for 35 years]; *Espinoza, supra,* 14 Cal.5th 311 [where defendant had come to the United States at the age of 13 and at the time of his plea had lived in the country for 23 years]; *Vivar, supra,* 11 Cal. 5th 510 [where defendant had lived in the United States for over 40 years]; and *People v. Camacho* (2019) 32 Cal.App.5th 998 [where at the time of his plea defendant had lived in the United States for 30 years].)

b. *Immigration Status*

The trial court acknowledged Mendez had lawful permanent resident status at the time of his plea. Nonetheless, the court minimized the effect of his status on his connection to the United States on the ground that his

---

[8] According to court records, Mendez was 18 years old at the time of his arrest.

14

young age "suggests that this step was undertaken on his parents' initiative rather than to fulfill some desire he had."

### c. *Connection to Country of Origin*

The trial court cited two examples of Mendez's connection to his country of origin to Guatemala to supplement its conclusion that he lacked ties to the United States: His involvement in the MS-13 street gang and the fact that he relied on a Spanish language interpreter during his section 1437.7 hearing.

### d. *Family Ties*

It is undisputed that at the time of his plea Mendez's parents and two sisters also lived in the United States with permanent resident status and that his parents and one sister have since become United States citizens. An infant nephew also had citizenship.

Since his release from ICE custody, Mendez has maintained close relationships with his parents and sisters, as well as his son who was born while he was in prison.

### e. *Work and Community Ties*

Since his release from ICE custody, Mendez has dedicated himself to correcting the negative path he had been on as a teenager. He has pursued an education, worked at improving both himself and his community, and now hopes to become a counselor to at-risk youth. But at the time of his plea, Mendez was 19 years old, involved in a street gang, enrolled in high school, and working part time.

15

Since his release from ICE detention, Mendez has unequivocally deeply engaged and connected with his community, and by extension, the United States. But we agree with the trial court that he has not met his burden of demonstrating substantial ties to the United States at the time of his plea. He possessed his green card and had several family members with legal status. But in part due to his young age, Mendez had not lived in the United States for a particularly lengthy period of time. And though enrolled in high school and working part-time, he was not productively engaged in his community. Rather, based on our independent review, we find that the close attachment to the United States he now possesses evolved after his release from nearly two decades in prison, rather than existed at the time of his plea.[9]

2. *The importance Mendez placed on avoiding deportation*

As discussed above, the trial court found not credible Mendez's testimony at his section 1437.7 hearing that his greatest concern at his plea proceeding was remaining in the United States. The court noted Mendez never raised immigration consequences as a concern at his hearing and concluded his sole focus was on minimizing his time in custody. We must defer to this finding.

3. *Mendez's priorities in seeking a plea bargain*

---

[9] We do not agree with the trial court that Mendez's relationship to his country of origin is relevant to assessing his ties to the United States. Thus, we do not address Mendez's argument that the trial court erred in considering his MS-13 membership and use of a Spanish language interpreter during court proceedings in evaluating that factor.

16

If convicted as charged, Mendez faced a possible life sentence of 75 years to life.  Moreover, Mendez acknowledged the evidence supporting conviction on the section 211, robbery charge was strong.  That charge alone carried an indeterminate sentence of 25 years to life.  As such, Mendez had every incentive to seek to mitigate his exposure, as he in fact did, through plea bargaining.

4. *Whether Mendez had reason to believe an immigration-neutral negotiated disposition was possible*

In her declaration submitted in support of Mendez's section 1437.7 motion, immigration attorney Reynolds identifies as a viable, immigration-neutral alternative a plea to section 246, with an admission to the gang allegation.  Such plea would have resulted in an indeterminate prison term of 15 years to life.  But since Mendez submitted Ms. Reynolds's declaration, the Ninth Circuit has held that section 246 "categorically qualifies as a crime involving moral turpitude" and thus, is not "immigration neutral."  (See *Lemus-Escobar v. Bondi* (9th Cir. 2025) 140 F.4th 1079, 1096 ["California Penal Code section 246 requires an intentional shooting of a firearm, that is, the use of a deadly weapon, in circumstances that necessarily pose a significant risk of bodily harm to another. . . .  Accordingly, the BIA did not err in denying cancellation of removal"].)  As such, Mendez has not identified an immigration-neutral alternative to his plea in this case to consider in evaluating prejudice.

5. *The probability of Mendez obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial*

17

As discussed, Mendez faced a sentence of 75 years-to-life if convicted as charged at trial. Until his change of plea, Mendez maintained his innocence on count 1, the attempted murder charge. But Mendez acknowledged the evidence of his guilt on count 4, the section 211 charge, was strong and that that charge carried a 25 years-to-life term of imprisonment. Thus, he decided to accept the certainty of the determinate sentence of 22 years, 8 months, despite having to plead to both counts 1 and 4. As such the probability of obtaining a more favorable outcome if he had rejected the plea was slim.

Having evaluated the *Vivar* factors, we find that Mendez has not carried his burden of proving by a preponderance of the evidence that any deficit in his understanding of the immigration consequences to his plea was prejudicial. Thus, we find no error in the trial court's denial of his section 1437.7 motion and affirm that denial.

II.     *Mendez's Claim of Violation Under the Racial Justice Act is Waived*

Mendez argues for the first time on direct appeal that the trial court violated the Racial Justice Act in denying his section 1437.7 motion. Thus, we find this claim is waived. (See *People v. Lashon, supra*, 98 Cal.App.5th at p. 813 ["It makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level . . . only to allow defendants who could have but did not use that procedure [to] pursue a [Racial Justice Act] claim for the first time on direct appeal"].)

## DISPOSITION

The trial court's denial of Mendez's motion to vacate his plea pursuant to section 1437.7 is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


GARCIA UHRIG, J.*

WE CONCUR:


ZUKIN, P. J.


MORI, J.

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.